IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 3, 2020

## IN RE  DAVID S. ET AL.

**Appeal from the Juvenile Court for Campbell County**
**No. 2018-JC-213    Amanda Sammons, Judge**

_____

**No. E2019-01190-COA-R3-PT**

_____

This is an appeal from a termination of parental rights case.  In terminating the parental rights of the children's father, the trial court found that two grounds for termination had been properly established:  abandonment by failure to provide a suitable home and persistent conditions.  The trial court also determined that it was in the children's best interest to terminate the father's parental rights.  In addition to terminating the father's rights, the trial court terminated the parental rights of the children's mother.  On appeal, we conclude that considerations of fundamental due process require us to vacate that portion of the final order terminating the rights of the mother.  We also conclude that one of the grounds relied upon for terminating the father's parental rights, persistent conditions, must be vacated due to the trial court's failure to consider all required elements of the statutory ground. The termination of the father's parental rights is otherwise affirmed, however, for the reasons stated herein.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part; Vacating in Part and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the court, in which JOHN W. MCCLARTY, J. joined. W. NEAL MCBRAYER, J., filed a separate opinion concurring in part and dissenting in part.

Timothy K. Jones, Knoxville, Tennessee, for the appellant, David S.

Herbert H. Slattery, III, Attorney General and Reporter; Kathryn A. Baker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

## BACKGROUND AND PROCEDURAL HISTORY

David S.[1] ("Father") is the father of the children who are the subject of this appeal. Cecilia S. ("Mother") is the children's mother. Although this opinion addresses the propriety of the trial court's termination as to both parents, the majority of our factual presentation herein will be tailored to Father. As explained below, the termination of Mother's parental rights must be vacated due to important due process concerns. The sufficiency of any factual allegations against her, therefore, are not properly before us at this juncture.

The Department of Children's Services ("the Department") initially became involved in this case in the summer of 2016. In alleging that the children at issue were dependent and neglected following its initial investigation into their care, the Department outlined as follows in its "Petition for Restraining Order and No Contact Order with *Ex Parte* Order," which was filed on August 24, 2016:

> 1. That it is upon your Petitioner's information and belief that the above-named children are dependent and neglected within the meaning of T.C.A. 37-1-102(b)(12).
>
> 2. That there is a danger of immediate harm to the children due to said dependency and neglect, specifically, it is alleged that a CPS investigation was initiated on 7/6/2016 with allegations of drug exposed child and environmental neglect. During the course of this investigation, it was discovered that [Father] had developed a friendship with [Dillion B.] [Father] and [Dillion B.] came to the DCS office in LaFollette on 8/19/16 with [Father] seeking help having his utilities reconnected. [Dillion B.] revealed on this date that he was planning to assist [Father] with childcare while [Father] works a 3[rd] shift job. Dillion stated that he was not living in the home with [Father] and his children at that time because the utilities were not on, but he was assisting the mother. . . . with taking care of the children at night at her home. Dillion stated he had not watched the children alone for more than 2 or 3 hours at a time, usually while [the mother] and her boyfriend . . . went to the store. Dillion stated he last watched the children alone a week earlier on Friday or Saturday.
>
> [Father] confirmed to CPSI that Dillion was planning to assist with

---

[1] This Court has a policy of protecting children's identities in parental termination cases. Therefore, when appropriate, we will present certain names by their initials.

childcare when the utilities were turned on. [Father] stated that he was aware that Dillion had been staying with [the mother] during the evenings and had been helping take care of the children.

CPSI Gaylor met with [Father] and Dillion together at DCS office, and Dillion stated he had recently pled guilty to statutory rape of a 13 year old girl in Sevierville. There have been previous DCS cases involving Dillion as an alleged perpetrator. In one of those cases, Dillion was named as the father of a child with a 14 year old girl with intellectual disabilities. Dillion was not substantiated in that case due to the age of the victim. In 2010 Dillion plead guilty to Rape of a Child and was placed on probation.

Due to the previous legal and CPS history, DCS is requesting that [Dillion B.] be prohibited from having any contact with [the children]. It is in the best interest of the children that a restraining order and/or no contact order be immediately entered to protect said children.

3. That it is in the best interest of said children and the public that this proceeding be brought and that said children be made wards of this Court.

On August 31, 2016, the Campbell County Juvenile Court ("the Juvenile Court") entered a "Temporary Bench Order of Custody," finding probable cause that the children were dependent and neglected. Therein, the Juvenile Court ordered that the children should be placed in the temporary custody of the Department and expressly noted that Father had agreed to this placement.[2] According to the order, although Father had reported that he was made aware that Dillion B. was a threat to the children, he had still allowed Dillion B. to be around them.

Following an adjudicatory hearing, on October 26, 2016, the Juvenile Court found, by clear and convincing evidence, that the children were dependent and neglected. The court's order provided that the children were to remain in the Department's custody, and Father was required to, among other things, submit to a psychosexual evaluation.

Although Father complied with aspects of permanency plans that were created for him in this case, a number of serious concerns remained and/or manifested following the children's removal from his care. Acute concerns existed as to Father's continued drug use, the suitability of his home, and alleged incidents of violence between him and other family members. We will endeavor to briefly outline some of these concerns here.

---

[2] The Juvenile Court also contemporaneously entered a separately styled "Preliminary Hearing Order," wherein it held that (1) probable cause had been shown to justify the children's removal and (2) Father had agreed that the children should be placed in the Department's custody.

Prior to the children's removal in 2016, Father pled guilty to misdemeanor domestic assault against the children's mother. Although Father was sentenced to probation in connection with this incident, additional allegations of violence were forthcoming. Notably, Father was charged with domestic assault on a second occasion in July 2018, against his own father. The second charge was dismissed, however, following his father's death. Concerns for violence also existed specifically in relation to the children. As related at the eventual termination trial in this matter, Father's oldest child had informed a foster care worker that Father had punched and pushed him. Notwithstanding the long-standing concern for violence evidenced by these accounts, Father never completed a required batterer's intervention program.

As previously detailed, the Department's initial involvement in this matter was precipitated by, among other things, allegations of drug use. Unfortunately, the period following the children's removal was marked by multiple instances of drug struggles that confirmed the seriousness of the initial allegations. For instance, Father's own admissions and the results of his drug screens revealed as follows:

- Father admitted to using THC[3] three days prior to a September 2016 drug screen.
- Father tested positive for amphetamine and methamphetamine on November 29, 2016.
- Father tested positive for methamphetamine on December 16, 2016.
- Father tested positive for THC on January 4, 2017.
- Father tested positive for amphetamine and methamphetamine on February 6, 2017.
- Father tested positive for amphetamine and methamphetamine on April 21, 2017.
- Father tested positive for methamphetamine on May 3, 2017.
- Father tested positive for bupronephrine, methamphetamine, and opiates on June 15, 2017.
- Father tested positive for THC on June 26, 2017.
- Father tested positive for methamphetamine on July 28, 2017.
- Father tested positive for THC on August 4, 2017.
- Father tested positive for THC on August 28, 2017.
- Father tested positive for amphetamine and methamphetamine on September 12, 2017.

Although Father left rehab in October 2017 and subsequently maintained negative drug screens for about a year thereafter, his drug usage ultimately recommenced. On October 4, 2018, Father tested positive for methamphetamine. On November 30, 2018,

---

[3] "THC is a marijuana metabolite that is stored in fat cells and can be detected in the body up to thirty days after smoking marijuana." *Interstate Mech. Contractors, Inc. v. McIntosh*, 229 S.W.3d 674, 677 (Tenn. 2007).

he tested positive for THC, and the following month, on December 21, 2018, he refused to be drug screened. On April 4, 2019, Father tested positive once more for THC.

Mental struggles on the part of Father clearly accompanied—and evidently in part fueled—his drug struggles. When testifying at the eventual termination trial about the period before he went to rehab and his usage of methamphetamine, Father remarked as follows: "Honestly I was just trying to kill myself." He stated that he had been trying to "kill the pain" and admitted that he had again "slipped up" when his grandmother died. Father was diagnosed with bipolar disorder and schizophrenia as an adult.

Father's housing situation remained a concern on several fronts. During one home visit in the fall of 2016, Father's home was found to be generally dirty and had a bed bug infestation. Moreover, in May 2017, Father's yard was filled with used needles, and he even admitted to picking up a vial of "dope" there. Father attributed the presence of these items on his property to others. Concerns also existed as to Father's desire to have his mother reside with him, as he had been removed from his own mother's care by the Department when he was a child. Moreover, at the time of the termination trial in this matter, evidence revealed that Father's home was unsafe for the children. Among other things, there was a hole in the floor right inside the front door.

Following the Department's filing of a September 2018 petition to terminate Mother and Father's parental rights, the Juvenile Court held a multi-day final hearing in this case over dates in April and June 2019. In July 2019, the Juvenile Court entered an order terminating both parents' parental rights. As to Father specifically, although the court did not find that the Department had proven all of the grounds set forth in the September 2018 petition, it held that two grounds had been properly proven by clear and convincing evidence. First, the Juvenile Court concluded that Father had failed to provide a suitable home for the children after reasonable efforts by the Department. *See* Tenn. Code Ann. § 36-1-113(g)(1); Tenn. Code Ann. § 36-1-102(1)(A)(ii). Second, the Juvenile Court held that the ground of persistent conditions had been adequately proven. *See* Tenn. Code Ann. § 36-1-113(g)(3). The Juvenile Court further determined that the termination of Father's parental rights was in the children's best interest. This appeal followed.

## STANDARD OF REVIEW

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." *In re M.L.P.*, 228 S.W.3d 139, 142 (Tenn. Ct. App. 2007). "Although this right is fundamental and superior to claims of other persons and the government, it is not absolute." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007). "It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). In Tennessee, "[w]ell-defined

circumstances exist under which a parent's rights may be terminated." *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *6 (Tenn. Ct. App. Apr. 27, 2015). Pursuant to the Tennessee Code, parties who have standing to seek the termination of a parent's parental rights must prove two things. They must first prove at least one of the statutory grounds for termination. *In re J.C.D.*, 254 S.W.3d at 438 (citing Tenn. Code Ann. § 36-1-113(c)(1)). Second, they must prove that termination of parental rights is in the child's best interests. *Id.* (citing Tenn. Code Ann. § 36-1-113(c)(2)).

Because the decision to terminate a parent's parental rights has "profound consequences," trial courts must apply a higher standard of proof in deciding termination cases. *In re M.L.P.*, 228 S.W.3d at 143. "To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth." *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at *2 (Tenn. Ct. App. Aug. 20, 2007). This heightened burden of proof "minimizes the risk of erroneous decisions." *In re M.L.P.*, 228 S.W.3d at 143.

Due to the heightened burden of proof required under the statute, we must adapt our customary standard of review. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). "First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d)." *In re M.J.B.*, 140 S.W.3d at 654. "Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights." *Id.*

**DISCUSSION**

Mother's Parental Rights

Although only Father has appealed from the judgment of the Juvenile Court, considerations of due process and fundamental fairness require us to address the manner in which Mother's parental rights were terminated. *See In re Stormie M.*, No. M2015-02336-COA-R3-PT, 2016 WL 5025999, at *8 (Tenn. Ct. App. Sept. 15, 2016) (concluding that fundamental fairness required the appellate court to address the manner in which a putative father's rights had been terminated); *see also In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *4-8 (Tenn. Ct. App. June 3, 2003) (vacating a termination order as to certain respondents when the record evidenced that the method selected to provide notice was not reasonably designed to provide notice). Specifically, we observe that there is no assurance in this record that Mother had proper notice of the termination proceeding. Moreover, the record reveals that she was never properly served.

Pursuant to our rules of appellate procedure, we retain the discretion to consider issues other than those specifically presented for our review when necessary to prevent injury to the interests of the public or prejudice to the judicial process. *See* Tenn. R. App. P. 13(b).

Service of a biological parent is not a perfunctory act but has constitutional implications. *In re Z.J.S.*, 2003 WL 21266854, at *6. Due process demands that defendants be given notice "that is reasonably calculated, under all the circumstances, to inform the defendants of the pending action." *Id.* The present termination case was filed in Juvenile Court, and as such, the default rule under current Tennessee law is that service of process "shall be pursuant to the Tennessee Rules of Civil Procedure." Tenn. Code Ann. § 36-1-117(m)(2). Pursuant to the Tennessee Rules of Civil Procedure, service upon defendants outside the state may be made "in any manner prescribed by the law of the state in which service is effected for an action in any of the courts of general jurisdiction in that state." Tenn. R. Civ. P. 4.05. Although the Department ostensibly attempted to rely on this rule inasmuch as it attempted to serve Mother by *substituted service* in Illinois, the attempted service was, as will be explained below, ineffective.

At the opening of the trial in this matter, Mother was not present. As a discussion emerged over Mother's absence, an attorney with the Department represented that Mother had been served and tendered evidence thereof as an exhibit. In attempting to explain to the court how the service was valid, the Department's counsel argued as follows:

> [W]e pulled up the Illinois law stating about service. If you can serve it upon an individual defendant, it shall be made by, one, leaving a copy of the summons with the defendant personally; two, by leaving a copy at the defendant's place of abode with some person of the family or a person residing there of the age 13 or upwards, and informing that person of the contents of the summons, provided the officer or other person making service shall also send a copy of the summons in a sealed envelope with postage fully prepaid and addressed to the defendant at his or her usual place of abode.

It is clear to this Court that counsel was alluding to the following provision from Illinois law:

> § 2-203. Service on individuals.
>
> (a) Except as otherwise expressly provided, service of summons upon an individual defendant shall be made (1) by leaving a copy of the summons with the defendant personally, (2) **by leaving a copy at the defendant's usual place of abode, with some person of the family or a person residing there, of the age of 13 years or upwards, and informing that**

**person of the contents of the summons, provided the officer or other person making service shall also send a copy of the summons in a sealed envelope with postage fully prepaid, addressed to the defendant at his or her usual place of abode**, or (3) as provided in Section 1-2-9.2 of the Illinois Municipal Code with respect to violation of an ordinance governing parking or standing of vehicles in cities with a population over 500,000. The certificate of the officer or affidavit of the person that he or she has sent the copy in pursuance of this Section is evidence that he or she has done so. No employee of a facility licensed under the Nursing Home Care Act, the Specialized Mental Health Rehabilitation Act of 2013, the ID/DD Community Care Act, or the MC/DD Act shall obstruct an officer or other person making service in compliance with this Section. An employee of a gated residential community shall grant entry into the community, including its common areas and common elements, to a process server authorized under Section 2-202 of this Code who is attempting to serve process on a defendant or witness who resides within or is known to be within the community. As used in this Section, "gated residential community" includes a condominium association, housing cooperative, or private community.

735 Ill. Comp. Stat. Ann. 5/2-203(a) (emphasis added) (internal footnote omitted).

Although this provision allows for substituted service, Illinois law is clear that in the case of substituted service, there must be "strict compliance with every requirement of the statute authorizing such substituted service, since the same presumption of validity that attaches to a return reciting personal service does not apply to substituted service." *State Bank of Lake Zurich v. Thill*, 497 N.E.2d 1156, 1162 (Ill. 1986). In elaborating on this notion, the Illinois Supreme Court explained that there must be an affirmative indication of compliance with the requirements of substituted service:

> [W]here personal jurisdiction is based upon substituted service of a summons, *the return or affidavit of service must affirmatively state* (1) that a copy of the summons was left at the usual place of abode of the defendant with some person of the family of the age of 13 years or upwards, (2) that such family member was informed of the contents of the summons, and (3) that the officer or other authorized person making service sent a copy of the summons in a sealed envelope with postage fully prepaid, addressed to the defendant at his usual place of abode.

*Id.*

Here, a discussion at trial between the Juvenile Court and counsel for the Department involved a number of shared statements suggesting that there were, in fact,

affirmative indications of compliance. The court remarked at one point, for example, that on October 13, 2018, "Ryan McCollum served the summons and the complaint on the defendant at her abode." Moreover, counsel for the Department remarked that the process server "sent [Mother a copy of the summons] in a prepaid envelope, postage prepaid." Both of these statements are not supported by the record, and neither the return nor the accompanying affidavit of service reflects strict compliance with the requirements in Illinois for substituted service.

Although both the return and affidavit of service contain the word "abode," there is no affirmative indication that the service address was Mother's "usual place of abode" as opposed to an abode of the substituted recipient. Moreover, although there is a notation on the affidavit of service that something was "mailed" and a further representation that the process server "[w]ent to Post office and got a new address," there is no affirmative writing sufficiently stating that the process server sent "a copy of the summons in a sealed envelope with postage fully prepaid, addressed to the defendant at his or her usual place of abode." There is not even a clear indication that whatever was sent was addressed to Mother. The identified "Recipient Name" appearing on the line above the "mailed" notation is "Terrell Evans," a purported acquaintance of Mother's.[4] Although the Illinois provision provides that "[t]he certificate of the officer or affidavit of the person that he or she has sent the copy in pursuance of this Section is evidence that he or she has done so," 735 Ill. Comp. Stat. Ann. 5/2-203(a), the affidavit contains no certification by the process server that he sent a copy of the summons pursuant to the provision. When considering this and the fact that there is no affirmative indication otherwise of strict compliance appearing, we conclude that the purported service on Mother was invalid. As explained below, however, even assuming strict compliance with the manner of service had been demonstrated, there remains another significant problem with the summons purportedly given to Mother in this case.

At trial, when the Juvenile Court inquired into how the termination hearing had been set, the following colloquy ensued between the court and counsel for the Department:

> [Department counsel]: This was set back at the initial hearing, which was on November 28th, and at that time, parents were appointed counsel, and the Department sent notice of today's hearing to all counsel since they were appointed to represent the parents.
>
> The Court: So in October 2018, before we came on November 28th, she wouldn't have been given today's court date for a hearing, but she was given what date? What day was she given when she was served?

---

[4] At trial, the Department represented that Mr. Evans was Mother's boyfriend. In the affidavit of service, the process server stated that Mr. Evans "said he was related to her."

- 9 -

[Department counsel]: It would be the initial permanency hearing, so November 28, 2018. That would be the notice that she was given, because that was the initial TPR hearing.

The Court: And she failed to appear on that date?

[Department counsel]: Correct. And she was appointed[5] counsel at that time[.]

The record does not support the above contention regarding notice. Rather, insofar as the record admits, Mother *was not provided any date* regarding the initial hearing. Namely, we observe that the summons issued in reference to Mother specifically reads as follows: "If you fail to file your answer within the time provided by law, or in the alternative appear in court on the date set, a judgment will be taken against you for the relief demanded in the Petition." The referenced Page 2 on Mother's summons, which ostensibly contained the date of the hearing, *is absent* from the copy contained in this record.

In light of the absence of a date included in the summons,[6] the absence of proper service on Mother, and Mother's eventual absence at trial, we fail to see how the termination of her parental rights can presently stand. Fundamental fairness dictates that the termination of her parental rights be vacated and, as to her, that the case be remanded for further proceedings. Certainly, the Department is permitted to pursue the termination of Mother's parental rights upon remand upon providing Mother her appropriate due process protections including service of process and proper notice of the proceedings.

In addition to the concerns discussed above, we also have concern about the manner in which Mother's appointed counsel performed his duties in this case. At a trial date in April 2019, Mother's counsel made the following comments:

I have had no contact with my client honestly, Judge[.]

. . . .

I've not heard a peep from her[.]

. . . .

---

[5] The order appointing counsel and setting the final termination hearing was not sent to Mother based on the included certificate of service, which incidentally contains no certification signature. Appointed counsel's name is, however, listed.

[6] We do not intend to suggest in any way that Father's summons was deficient in this respect. It was not.

- 10 -

I have had no contact with her whatsoever.

When asked by the Juvenile Court if he had made any effort to contact Mother by sending her a letter to the address where service had been attempted on her at Mr. Evans's address in Illinois, Mother's appointed counsel indicated that he *had not done so*:

> At this point, Judge, I mean, I had not, because I had not seen that she had been -- *I had not noted in the file where service was*, so I didn't have a valid address for her. I've never had one throughout the entire proceeding. I will say that I did not have that.

(emphasis added). This is troubling. Although we have held herein that the attempted service on Mother was invalid, we have serious concern that counsel did not even attempt to contact Mother at an address that he should have known was being relied upon by the Department for establishing service. Counsel's comments reflect that he had not given Mother or the case file any serious attention.

When the termination trial was subsequently reconvened in June 2019, Mother's appointed counsel was not even present. According to the guardian ad litem's statement to the Juvenile Court, Mother's counsel was in a "very unusual and personally difficult situation" in another county. She stated that she "didn't want all of his business on this record." When the Juvenile Court asked if this representation meant that Mother's counsel would not be able to attend the proceedings, counsel for the Department indicated that was correct, stating, "He won't be able to come."

The transcript reveals that the guardian ad litem then showed the Juvenile Court an image on her phone, an image purportedly depicting an envelope that Mother's appointed counsel had allegedly attempted to send to Mother after the original trial setting. No representation was made on the record at the continued hearing before the Juvenile Court as to what communication this alleged envelope contained,[7] and it appears that whatever was sent was undeliverable. The Juvenile Court then asked those present if Mother's counsel was asking to withdraw *through* the guardian ad litem, counsel for the Department, and counsel for Father. The guardian ad litem did not agree with this, instead stating that, "Well, I think his first request was for a continuance." The court then proceeded, however, to ask if anyone wanted to "argue against [Mother's counsel's] motion to withdraw that's been made through these other attorneys." In the face of no objections to a motion that *had not actually been made* at this hearing,[8] the Juvenile

_____

[7] The transcript suggests that Mother's appointed counsel was directed, by a text message sent by the guardian ad litem during trial, to file the alleged envelope as a late-filed exhibit. Insofar as we are able to tell, this never occurred. Even if this envelope had been filed, it is unclear how that would be dispositive of our present review and change our conclusion that the termination of Mother's rights must be vacated in this appeal.

[8] Mother's appointed counsel had requested to withdraw at the original trial setting, but that

- 11 -

Court ruled that it would allow Mother's appointed counsel to withdraw. The presentation of proof then continued without Mother or her appointed attorney present. Interestingly, the termination order does not speak of this purported withdrawal. Rather, the order references a prior denial of a motion to withdraw that Mother's counsel had made at the original trial setting. Moreover, the final termination order's certificate of service lists counsel for Mother, not Mother, even though the court proceeded with the trial having ruled that Mother's counsel would be allowed to withdraw without having made a motion to do so, *in absentia*.

Regardless of the lack of cohesion between the court's order and its actions at trial,[9] the manner in which Mother's case was handled at trial is both odd and of grave concern. Mother's appointed counsel did not renew any request to withdraw and, insofar as the transcript reveals from the hearsay comments of the guardian ad litem, would have merely requested a continuance. Yet, the court treated a motion to withdraw as having been made *through those other parties present*, with no indication that Mother had received any notice of such a request. We need not belabor our concern about this matter any further in light of the service issues already detailed above, but suffice it to say, there would be a fundamental fairness concern here as well even if proper service had been achieved.

Father's Parental Rights

Having determined that the Juvenile Court's decision to terminate Mother's parental rights should be vacated, we now shift our attention to Father. In the "Statement of the Issues" section of his appellate brief, Father raises the following for our review:

---

particular request was denied.

[9] On the one hand, the court proceeded on paper as if Mother's appointed counsel was still of record. On the other hand, it proceeded at the final trial setting having ruled that said counsel could withdraw. As an aside, notwithstanding the litany of concerns we have detailed herein surrounding service on Mother and her notice of the proceedings, there would still be a potential concern on appeal even if she had actively participated at trial. The notice of appeal that was filed did not list Mother (or her appointed counsel) on the certificate of service, nor was the guardian ad litem listed. Under the rules of appellate procedure, the notice of appeal should "include a list of the parties upon whom service of notice of docketing of the appeal is required." Tenn. R. App. P. 3(f). This Court's internal computer records do not list Mother as a party to the appeal, and thus, she would not have received any of the orders entered by this Court during the pendency of the appeal. Father's brief purports to have been sent to "all counsel," whereas the Department's brief omits Mother and Mother's appointed counsel from the certificate of service. In any event, even assuming Mother had been served and participated at trial and somehow had notice of Father's brief, there does not appear to be any indication that Mother had notice of an appeal during the pendency of the period where the appellate record was prepared. The fact that Mother did not file a notice of appeal would not be dispositive even assuming she had been served and participated at trial. *See* Tenn. R. App. P. 3(h) (providing that "upon the filing of a single notice of appeal . . . issues may be brought up . . . by any party").

- 12 -

I.       Whether the trial court erred by finding that statutory grounds for termination existed as to Father.

II.      Whether the trial court erred by finding that termination was in the children's best interest.

His brief then goes on to specifically challenge both grounds for termination found against him by the Juvenile Court, in addition to criticizing the court's best interest determination. We observe that even if Father's brief had been less comprehensive in scope, our review could not be. As the Tennessee Supreme Court has made clear, in order to help "ensure that fundamental parental rights are not terminated except upon sufficient proof, proper findings, and fundamentally fair procedures," we are required to review the trial court's findings as to each ground for termination and as to whether termination is in the children's best interest. *See In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[I]n an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

*Abandonment by Failure to Establish a Suitable Home*

Pursuant to Tennessee Code Annotated section 36-1-113(g)(1), "[a]bandonment by the parent or guardian, as defined in § 36-1-102" may constitute a ground for termination. In turn, the referenced section of 36-1-102 contains several distinct statutory meanings of abandonment. As is relevant here, the pertinent definition of abandonment is specifically located at Tennessee Code Annotated section 36-1-102(1)(A)(ii) and reads as follows:

*(a)* The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

*(b)* The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

*(c)* For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to

provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii).

In connection with this ground for termination, it should be noted that the concept of a home's suitability is not a narrow one limited solely to consideration of the physical structure of the parent's residence. Indeed, as this Court recently explained:

> "A suitable home 'requires more than a proper physical living location.'" *In re Navada N.*, 498 S.W.3d 579, 595 (Tenn. Ct. App. 2016) (quoting *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)). A suitable home requires "[a]ppropriate care and attention ... to the child." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016). The home must also "be free of drugs and domestic violence." *In re Hannah H.*, 2014 WL 2587397, at *9.

*In re Josiah T.*, No. E2019-00043-COA-R3-PT, 2019 WL 4862197, at *7 (Tenn. Ct. App. Oct. 2, 2019).

Upon our review of the record, the evidence supports the conclusion that this ground was properly established by clear and convincing evidence. First, we observe that the children were removed from Father's care upon the filing of a petition alleging that they were dependent and neglected, and further, we note that they were placed in the custody of the Department. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)*(a)*. In fact, the record shows that Father actually agreed that the children should be placed in the Department's custody. Second, we observe that, incident to the children's removal, the removing court found that reasonable efforts had been made to prevent the need for removal. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)*(b)*.

As for the efforts made in the four-month period after removal,[10] the record reveals that, notwithstanding substantial support from the Department, Father did not

---

[10] In this case, the Juvenile Court looked to this particular window of time. Although there certainly was no error in the Juvenile Court's decision to focus on the four-month period immediately after the children's removal, we observe that the focus of a court's inquiry under this ground need not be strictly limited to that time period. *See In re C.M.*, No. E2018-02108-COA-R3-PT, 2019 WL 3812421, at *8 n.2 (Tenn. Ct. App. Aug. 14, 2019).

establish a suitable home. Although there is proof that Father made some efforts to improve himself personally during the period, namely in regard to certain required assessments, testimony from the Department also indicated that it was towards the end of the four-month period that he actually started to do "things that he needed to do." Moreover, the evidence was clear that Father did not have a suitable home for the children during the period despite a myriad of efforts from the Department. Father did not disagree that the Department had given him support following the children's removal, and he was actually somewhat effusive in his praise of Mindy Hall, the foster care worker assigned to the family following the children's removal. Father testified that he "ended up loving [Ms. Hall] . . . to death" and claimed that she helped him a lot, when he "gave her a chance."

Having reviewed the evidence, we can see why Father spoke so favorably of Ms. Hall. Ms. Hall stated that she had regular contact with Father, set up supervised phone calls for him on weekend nights in order to accommodate his schedule, and also arranged for visitation "after hours." In specifically elaborating on the support the Department gave Father to assist him in providing the children with a suitable home, Ms. Hall testified as follows:

> I gave him information as to where he could go and get his assessments completed. We set up PSGs for parenting education, because he was fearful, when the children first came in, about making mistakes as a parent, and he wanted that help, so we set that up for him. There were times that I would make a binder for him, I would print out months of calendars and I would write in dates, visits, things to that nature, things he needed to do. I would put all the important documents in this binder for him, as far as his perm plan, highlight these things. I would research apartment buildings for him, houses for rent in the area for him. We even looked some in Anderson County for housing options, and I would research these. I would write down the phone numbers, I would give them to him, and he was to follow through as far as that went.

Father's home, however, remained a concern. Ms. Hall testified that it "was not appropriate." In October 2016, she completed a home visit and observed a bed bug infestation. In her testimony, Ms. Hall described the home as "generally dirty" and also remarked that there were safety concerns. According to her, Father also had issues with electricity and utilities. Whereas the Department put in for homemaker services for Father, Ms. Hall testified that the problems in his home were never fixed as far as she was aware. Moreover, transcending concerns as to the physical suitability of the home, concerns also existed as to Father's personal state. Indeed, Father testified positive for illegal drugs throughout the four-month period following removal. The trial court was not without basis in concluding that, regarding his efforts to improve his home and personal condition, Father had demonstrated "a lack of concern for his children to such a

degree that it is unlikely he will be able to provide a suitable home for the children at an early date."

In light of the above discussion, we conclude that this ground for termination was supported by clear and convincing evidence. Further, we observe that the record actually shows that Father's failure to establish a suitable home persisted long after the four-month period discussed by the trial court. As previously detailed, although Father did eventually establish clean drug screens for a time during the pendency of this matter, this apparent progress soon waned. In months leading up to trial, Father tested positive for drugs on several occasions, and concerns persisted as to the physical condition of his home, which had a hole in the floor right inside the door. Moreover, concerns existed as to Father's desire to live with his mother, from whose custody Father had been removed when he was a child amidst allegations of sexual abuse. Testimony also revealed that after Father completed a psychosexual assessment, it had been recommended that his children not be returned to his care. Further, notwithstanding the concerning history of allegations of domestic violence at the hands of Father, he never completed the batterer's intervention program required of him. As we have already noted, a suitable home requires more than just an appropriate physical structure. *See In re Josiah T.*, 2019 WL 4862197, at *7. Here, of course, there were concerns not only as to the physical suitability of Father's home, but also as to his ability to provide appropriate care. Having reviewed this ground for termination, we turn our attention to the remaining ground found by the Juvenile Court to terminate Father's parental rights.

*Persistent Conditions*

Tennessee Code Annotated section 36-1-113(g)(3) outlines the ground for termination commonly known as "persistence of conditions." When the termination petition was filed in this matter, the ground applied when:

> The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
> (iii) The continuation of the parent . . . and child relationship greatly

- 16 -

diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A). The purpose behind this ground "is to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008).

Having reviewed the Juvenile Court's order, we are compelled to vacate this ground for termination. In relevant part, we observe that the Juvenile Court's order reads as follows as it pertains to this ground:

> The conditions that led to the children being in foster care persist to this day. [Father] is still testing positive for illegal substances, does not have a suitable home for the children, and continues to incur new criminal charges. Continuation of the parent/child relationship greatly diminishes the children's chances of being placed into a safe and stable permanent home.

As should be evident, the Juvenile Court failed to make specific findings regarding each of the elements applicable to the persistence of conditions ground. Namely, the "likelihood that [the persistent conditions] will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future" is wholly unexamined. Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii). The consideration of potential remediation is an express requirement under this ground. *See In re Aaron E.*, No. M2014-00125-COA-R3-PT, 2014 WL 3844784, at *9 (Tenn. Ct. App. Aug. 4, 2014) ("[T]he trial court is required to consider the likelihood that the conditions will be remedied such that the child can be safely returned to the parent in the near future."); *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *11 (Tenn. Ct. App. June 10, 2014) (noting that the persistence of conditions ground also requires the court to find that there is little likelihood of remediation at an early date).

We have previously vacated a trial court's reliance on this ground when the likelihood of remediation was not subject to any finding in the order of termination. As we explained:

> The absence of appropriate findings supporting this ground for termination is not a trivial concern. With respect to termination cases, the trial court is specifically directed by statute to "enter an order that makes specific findings of fact and conclusions of law." Tenn. Code Ann. § 36-1-113(k). Because the trial court did not make specific findings regarding each of the elements applicable to the persistence of conditions ground, we are

- 17 -

compelled to vacate the termination order with respect to this ground for termination as to both parents and, as to Father, remand for the preparation of appropriate findings of fact and conclusions of law as required by statute. *See State v. C.H.K.*, 154 S.W.3d 586, 591 (Tenn. Ct. App. 2004) (vacating ground of abandonment finding under Tennessee Code Annotated section 36-1-102(1)(A)(iv) and remanding for findings when the trial court's order failed "to set forth any findings which show either that C.H.K. was incarcerated on July 18, 2002, the date D.C.S. filed its petition instituting termination proceedings, or that she was incarcerated during all or part of the four months immediately preceding that date"). Further findings as to Mother on this ground for termination are unnecessary given our ultimate disposition herein, which includes our affirmance of the termination of her parental rights.

*In re Mickeal Z.*, No. E2018-01069-COA-R3-PT, 2019 WL 337038, at *13 (Tenn. Ct. App. Jan. 25, 2019) (internal footnote omitted).

Given the absence of all findings requisite to support this ground for termination, we hereby vacate the persistence of conditions ground. Because our ultimate disposition herein includes an affirmance of the termination of Father's parental rights, however, we need not remand for further findings as to Father. Having determined that the record clearly and convincingly established the ground for termination of abandonment by failing to provide a suitable home, we now turn to a consideration of the children's best interests.

*Best Interests*

When at least one ground for termination has been properly established against a parent, this Court shifts its focus to whether termination of the parent's parental rights is in the child's best interests. "Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013). As such, "[w]hen at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest." *Id.* at 572.

When conducting a best interests analysis, conflicts between the interests of the parent and child are to be resolved in "favor of the rights and best interest of the child." *Id.* at 573 (citing Tenn. Code Ann. § 36-1-101(d)). The best interests analysis "must be viewed from the child's, rather than the parent's, perspective." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). In Tennessee, the General Assembly has codified a list of nine non-exclusive factors that trial courts are to consider when

conducting a best interests inquiry in termination cases. These factors are as follows:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
>
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
>
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "Ascertaining a child's best interests does not call for a rote examination" of these factors, and "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878.

In analyzing the children's best interests and in concluding that clear and convincing evidence supported termination, the Juvenile Court made several findings, including the following:

- Father had not made a change in his conduct or circumstances that would make it safe for the children to go home.
- Father had not made a change in his conduct, circumstances, or lifestyle to make it safe for the children to go home, notwithstanding reasonable efforts by the Department.
- A change of caretakers and physical environment of the children would have a detrimental effect on the children.
- Father continued to abuse drugs.
- Father's home was not healthy or safe. Father's home had a large hole in the floor. Father lived with his mother who was accused of sexual abuse, causing Father to be removed from her home when he was a child.
- Father's emotional state would be detrimental to the children.

Having reviewed the record transmitted to us on appeal, we agree with the Juvenile Court that the termination of Father's parental rights was in the children's best interests. Father continues to struggle with drugs, and despite the seriousness of the issue, he evidently refuses to accept personal responsibility. In this regard, we observe that he testified at trial as follows: "I'm testing positive for stuff that I ain't been doing."

The Juvenile Court orally remarked upon the conclusion of trial that it did not question the sincerity of Father's love for the children, but obviously, it found that the children's best interests weighed in favor of termination. We agree. Much time has passed, and yet, at the time of trial, which was well over two years after the children's removal, Father was in no position to take care of the children. Among other things, Father's home remained problematic, he had never completed the required batterer's intervention program, and, as noted, he continued to use drugs. In contrast to the picture surrounding Father, the children were doing well in a pre-adoptive foster home and reportedly wanted to be adopted. The children's current foster mother indicated that the children had been in her home for over half a year. She testified that the children were bonded to her and vice versa, and according to her, the children called her "Mom." She stated that if Father's rights were terminated, she would want to adopt the children. According to Emily Ford, the foster care worker for the children at the time of trial, the children were "very bonded to the foster parents." Ms. Ford opined that a change of caretakers and physical environment would be detrimental to the children's emotional and psychological conditions. The children deserve permanency at this point, and, as to Father, the totality of the circumstances clearly and convincingly weighs in favor of the termination of his parental rights.

## CONCLUSION

The termination of Mother's parental rights is hereby vacated, and as to her, this case is remanded for such further proceedings as may be necessary and consistent with this opinion. Although we vacate the Juvenile Court's reliance on the persistence of conditions ground for terminating Father's parental rights, the termination of Father's parental rights is otherwise affirmed for the reasons stated herein.

_____
ARNOLD B. GOLDIN, JUDGE